# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

LINDA LIEVING,

> Plaintiff,

v.                                        CIVIL ACTION NO.   3:13-27455

PLEASANT VALLEY HOSPITAL, INC.,
and THOMAS SCHAUER,

> Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 57. For reasons explained below, Defendants' motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

In October 2013, Plaintiff Linda Lieving filed the instant action in this Court against Defendants Pleasant Valley Hospital, Inc. ("PVH"), and Thomas Schauer—respectively, Plaintiff's former employer and its CEO throughout the time period during which the alleged violations are purported to have occurred.  In the Complaint, Plaintiff alleges discrimination against her by Defendants based on her gender, in violation of Title VII of the Civil Rights Act of 1964 and in violation of the West Virginia Human Rights Act, West Virginia Code § 5-11-1 *et seq.*[1]

---

[1]  Additionally, Plaintiff alleged discrimination and retaliation for her "good faith reports of wrongdoing and waste by Defendants," in violation of West Virginia's Patient Safety Act. Compl. ¶¶ 38-42, ECF No. 1.   On April 11, 2014, this Court dismissed Plaintiff's Patient Safety Act claims against both Defendants. ECF No. 23.

A. *General Background Related to PVH and Plaintiff's Duties*

Plaintiff's complaint arises from events and relationships among PVH employees. According to its Director of Human Resources, David Brown, roughly 82% of all PVH employees are female and half of PVH management employees are female.[2] Brown Dep. 18:1–11, Aug. 22, 2014, ECF No. 57-2.   PVH maintains a sexual harassment policy,[3] and to the knowledge of Mr. Brown, is not presently facing other claims of gender discrimination. Def.'s Ex. R, PVH Sexual Harassment Policy, ECF No. 57-3; Brown Dep.   19:7–17.

In April 2007, Ms. Lieving began working for PVH as the Director of Home Health and Hospice.   In August 2010, coincident to a re-organization, Ms. Lieving accepted a position with PVH as the Director of Quality and Accreditation.   In that role, Ms. Lieving was responsible for "developing, implementing, directing, and managing all aspects of quality improvement and Joint Commission on Accreditation of Healthcare Organizations ("JCASHO") services at the Hospital." Def.'s Mem. 2 (citing Compl. at ¶5), ECF No. 58.   Related to those responsibilities, Ms. Lieving would inspect conditions across departments to identify, report, and resolve compliance issues. *Id.* Additionally, Ms. Lieving was one among sixteen employees that served on PVH's Administrative Council.   Schauer Dep. 10:19–13:11, Aug. 22, 2014, ECF No. 60-1; Lieving Dep. 15:15–18:12, Oct. 10, 2014, ECF No. 59-2.   In 2011, as interim CEO, Thomas Schauer replaced the Administrative Council with a newly created senior leader group composed of only four employees from among the previous group of sixteen. *Id.*   Ms. Lieving was not among the four employees that served in the senior leader group. *Id.*

_____

[2] During his deposition, Mr. Brown offered these facts as a basis for denial of Plaintiff's gender discrimination claims, but the Court notes that the facts are introduced here merely as background data.   As a matter of common sense, these numbers alone do not foreclose the possibility of gender discrimination in the workplace.

[3] Though characterized by Defendants as an "anti-discrimination policy," the document is in fact addressed to the more narrow subject of "Sexual Harassment."

**B.  *July 26, 2012 Emergency Department Hostage Drill***

On July 26, 2012, Ms. Lieving participated in a mock hostage situation in the PVH

Emergency Department ("ER"). Lieving Dep. 23:6–12.   While waiting for the exercise to begin,

Ms. Lieving went ahead into the ER to "see if there were patients" and "how busy they were." *Id.*

at 23:13–24:2.   After seeing no staff caring for patients, Ms. Lieving informed Jamie Spires, an

RN at the nursing station, that she would be conducting a quick mock survey. *Id.* at 23:22–24:13.

In the course of conducting that mock survey, Ms. Lieving recognized a number of compliance

issues in the ER, notably including an unlabeled syringe with medication left unattended on a desk.

*Id.*

Having found such issues, Ms. Lieving then proceeded to immediately relay her findings to

the assembled ER staff.[4] Lieving Dep. at 26:23–27:18.   Upon doing so, Ms. Lieving recounts

being interrupted by Nurse Kevin Hill. *Id.*   As described by Ms. Lieving, shouting, Nurse Hill

"leaned close to my face, close to me, pulled me over, and told me that I was offensive, I was

crazy. Everybody knew this before I got there." *Id.* at 27:22–28:6.   Ms. Lieving recounts moving

away from Nurse Hill, but he continued to yell louder, even flinging his arms toward Ms. Lieving

and thereby invading her "personal space."[5] *Id.* 29:3–13.   Ultimately, Ms. Lieving backed out of

the ER into the hallway to wait for the hostage drill to begin. *Id.* at 30:6.   Though Ms. Dye denies

having said anything of the sort, Ms. Lieving further recounts that Ms. Dye apologized to her

---

[4] The assembled staff witnessing the incident include: Nurse Kevin Hill, Nurse Jamey Spires, Sam Blaine (a nursing student), Jackie Dye (ER Nurse Manager), Russ Casto (intern), and Dr. Crouch. Hill Statement, Def.'s Ex. B, ECF No. 57-1 at 22

[5] While Ms. Lieving recalls Nurse Hill moving toward her as he spoke, Ms. Dye repeatedly offered deposition testimony that Nurse Hill was seated in a chair during the incident. Dye Depo. at 8–9, ECF No. 57-2.

immediately afterward, saying that she was "sick at [her] stomach" following the incident.[6] Lieving Dep. 30:11–14; Dye Dep. 17:1–20.

### C. *Resulting Complaints by Plaintiff Lieving*

Immediately after the hostage drill, Ms. Lieving sought a meeting with Mr. Schauer to report a grievance against Nurse Hill.   Eventually, Ms. Lieving was able to meet with Mr. Schauer and Mr. Brown, and she was advised to submit a memo outlining her complaints.   Ms. Lieving drafted a memo briefly recounting the event, particularly referring to Nurse Hill's "disruptive behavior," and as directed, distributed the memo to Jackie Dye, ER Nurse Manager, with copies provided to Amber Findley, Senior Director of Nursing & NRC Administrator, Thomas Schauer, and David Brown. July 26, 2012 Memo, ECF No. 59-1 at 1.   In the memo, Ms. Lieving recounted that Nurse Hill interrupted her by loudly asserting "you're offensive" and continuing on from there.[7] *Id.*   Ms. Lieving further offered that Nurse Hill's interruption "prohibited any useful education for himself and the other staff present." *Id.*   In addition to the memo addressing Nurse Hill's conduct, Ms. Lieving sent an email to Jackie Dye and Amber Findley listing the quality-related issues Plaintiff observed during her brief survey of the ER earlier that day. July 26, 2012 Lieving Email, ECF No. 59-1 at 2.

At the suggestion of David Brown, on or about August 7, 2012, Ms. Lieving met with David Brown, Jackie Dye, and Kevin Hill.   Ms. Lieving recounts that David Brown called her to his office to discuss "the Kevin Hill incident" shortly before convening the meeting, but without

---

[6] Indeed, Ms. Dye agrees that Nurse Hill's behavior was offensive, but to her recollection, Ms. Lieving was offensive as well.   According to Ms. Dye, Ms. Lieving "started offensive first. It was his response to her. He didn't interrupt her being offensive.   She was offensive asking about the syringe . . . they were both offensive, but she was loud, angry and demeaning asking about the unlabeled syringe in her manner, and his response was loud back." Dye Dep. 19:22–20:4.

[7] In contrast, to Ms. Dye's recollection, Nurse Hill said, "[y]our tone is offensive. You can't talk to me like that." Dye Depo. at 9–10, ECF No. 57-2.

warning Ms. Lieving that Nurse Hill would also be present for the meeting. Lieving Dep. 50:8–52:2. Upon hearing that Nurse Hill was on his way to join them, Ms. Lieving recalls saying something to the effect of expressing that she did have a problem meeting with Nurse Hill, that she was afraid of Nurse Hill, and that she would stay for the meeting because she nevertheless wanted to work for Pleasant Valley. *Id.* By Plaintiff's account, this would have been the second occasion where she specifically told David Brown that she was afraid of Nurse Hill. *Id.* at 52:3–52:7.

Ms. Lieving remembers the roundtable meeting as ostensibly being a second opportunity for Nurse Hill to act out towards her without reprimand from his superiors. Lieving Dep. 53:2–54:18. Ms. Lieving recalls repeatedly being reminded by Nurse Hill that she is "just offensive," and Nurse Hill raising his voice, getting red in the face, and pounding on the table with his open hand.[8] *Id.*

At the close of the August 7, 2012 meeting, Ms. Lieving recalls no clear resolution, but simply the meeting being ended by Mr. Brown, followed by laughter from Nurse Hill and his departure in the company of Jackie Dye. Lieving Dep. 59:9–60:6. Thereafter, Ms. Lieving did not have any significant contact with Nurse Hill.[9] *Id.* at 57:12–59:3. Furthermore, she offers no

---

[8] In contrast, according to Ms. Dye, the meeting was productive:

> They both agreed that it could have been handled different . . . It was a very, very good meeting. No one laughed, made fun of each other. No one got angry.

> I thought we worked out a way he was going to agree to be a better part of quality . . . and he followed through. It wasn't an embarrassing yelling, laughing match at all. I thought it was a very productive meeting. There was no disrespect during the meeting that I felt at all on either side. No laughing or yelling.

Dye Depo. at 34:13–35:12, ECF No. 57-2.

[9] Ms. Lieving was seated immediately next to Nurse Hill during a board meeting, but Plaintiff and Nurse Hill did not talk with one another on that occasion. *Id.* at 57:12–58:15. Apart from sharing a room during that board meeting, Plaintiff recounts leaving rooms upon finding Nurse Hill already present and having no other interactions with him. *Id.* at 58:16–59:3. These limited reactions are consistent with Ms. Lieving's claimed fearfulness.

evidence that Nurse Hill exhibited any threatening or hostile behavior toward her or any other females after this meeting.

Dissatisfied with the handling of the July 26th incident, on August 17, 2012, Plaintiff Lieving drafted and reportedly hand-delivered a memo to Mr. Schauer expressing her continuing concerns related to perceived disruptive behavior.[10] August 17, 2012 Memo, ECF No. 59-1 at 3; Lieving Dep. at 62:3–64:20.   The memo specifically references continued concern stemming from the incident with Nurse Hill on July 26, 2012, explaining that Ms. Lieving was "not satisfied" with how her complaints about the situation were addressed and felt that Nurse Hill's conduct was "based, at least in part, on my gender." *Id.*   Her memo does not identify anyone other than Nurse Hill as the source of her grievance.   Ms. Lieving then references the conduct of former employee Hugh Collins, which had made her "feel uncomfortable on a daily basis because of the same type of behavior." *Id.*   As explained by Ms. Lieving, during Mr. Collins' tenure, she was regularly uncomfortable and "[s]exual topics were commonplace at the Administrative Council." Lieving Dep. 67:22–68:14.   According to Plaintiff, "these were the same behaviors that [PVH employees] were promised . . . that Tom Schauer would not allow or would not turn his head to . . ."[11] *Id.*   Ms. Lieving closes the memo by explaining that without enforcement of the chain of command, she is unable to do her job, and asking that Mr. Schauer "take action to stop" what Ms. Lieving would characterize as a "hostile work environment." *Id.*

---

[10] Mr. Schauer could not recall receiving the August 17, 2011 memo from Ms. Lieving. Schauer Depo 19:2–12.   However, Lucinda Jordan, Mr. Schauer's former administrative assistant, found the August 17, 2011 memo while clearing out Mr. Schauer's credenza after he left PVH in early 2013. Jordan Depo. 4.   Plaintiff maintains that finding the August 17, 2011 memo in Mr. Schauer's credenza inferentially supports Ms. Lieving's testimony that she delivered the memo to Mr. Schauer.

[11] Plaintiff offered testimony that not only did Defendant Schauer not stop such behaviors, but that he and Bill Barker continued to conduct themselves in a manner that regularly made Plaintiff feel uncomfortable. Lieving Depo. 69:10–70:24.

With nothing more than speculation offered to explain why, no one from PVH followed-up with Ms. Lieving about the resolution of her grievance. Lieving Dep. 110:19–22, 111:18–20.

### D.  *Collateral Employment Related Events and Circumstances*

In further support of her complaint, Ms. Lieving also recounts a number of collateral workplace events or issues, which she suggest evidence the hostile nature of the workplace. Discussed in turn below, these instances include Nurse Hill's recognition as "Employee of the Month," Plaintiff's own speculations related to Nurse Hill's effect on other female employees, workplace gossip, and offensive workplace comments and conversation.

First, in September 2012, Nurse Hill was nominated for "Employee of the Month" by Nora Loomis.   On September 10, 2012, Jeannie Hickman announced that Nurse Hill would receive the "Customer Service Employee of the Month" award. Ex. G of Def.s' Reply, ECF No. 60-1 at 76. Ms. Loomis testified that she nominated Nurse Hill for the award based on the care he provided to her during an ER visit, and that it was solely her own idea to submit the nomination. Loomis Dep. 15:1–17:9. At the time, Ms. Loomis was employed as an Administrative Assistant to William Barker, then Senior Vice President of Administration. *Id.* at 6:17–20.   Though Ms. Lieving has argued that Mr. Schauer and Mr. Barker coerced the nomination for the purpose of humiliating her, she does not believe Ms. Loomis shared that motivation, she never heard anyone suggest to Ms. Loomis that she submit a nomination, and she has no tangible evidence to otherwise support her speculative conclusion. Lieving Dep. 106:13 – 107:01.

The award was presented to Nurse Hill during a board meeting on the evening of September 17, 2012, a board meeting that Mr. Schauer specifically required Ms. Lieving to attend.[12]   Late in the afternoon before that meeting, Ms. Lieving recalls that Mr. Schauer walked

---

[12]  Defendants conclude that because Nurse Hill's award was announced on September 10,

into her open office and said, "I just wanted you to know that Kevin Hill is going to be recognized at the board meeting tonight.  I know this will grate on your nerves." Lieving Dep. 99:4–18. Though Ms. Lieving considered this award as some sort of endorsement of Nurse Hill's treatment of her, there is simply no evidence to support such an inference.  In fact, the only evidence explaining Hill's selection indicates that other females in the workplace had no issue with his award.

Additionally, Ms. Lieving has offered speculation related to Nurse Hill's effect on other female employees.  Though no more substantiated than a feeling, Ms. Lieving believed that "Jackie Stewart and Jackie Dye were not going to correct Kevin Hill and the way he handled medications in the emergency department because he was male and they were female and he would retaliate against them." Lieving Dep. 85:4–9, 86:7–11.  Regarding the issue of safe medication storage, Plaintiff further testified that, in her opinion, "if Jackie Stewart or Jackie Dye were expected to take action to correct these [issues] and it involved Kevin Hill, that they would take pause and have reason to consider the repercussions against them if they were going to make that correction." *Id.* at 87:10–20.[13]  Ms. Lieving's testimony is nothing more than her perception, with no other statement or incident providing a basis for her opinion.

---

2012, Mr. Schauer could not have known that Nurse Hill would be receiving the award when he told Ms. Lieving to attend the September 17th board meeting in the first week of September (sometime between September 1–7, 2012).  In doing so, Defendants conclude too much.  The announcement provides evidence of when the selection was publically announced to PVH employees, but not when the selection was made.  As CEO, it is perfectly fathomable that Mr. Schauer may have been informed of the award sometime before public announcement.

[13]  In contrast, both Jackie Stewart and Jackie Dye provided unsworn declarations saying that Kevin Hill had "never intimidated, harassed, or otherwise behaved inappropriately towards" either of them. Ex. F of Def.'s Reply, ECF No. 60-1 at 72.  Both Ms. Stewart and Ms. Dye further explained: "I have never felt that I couldn't complain, or file a grievance, about a male employee for fear of not being protected by the Hospital or for any other reason." *Id.*

Next, Ms. Lieving recounts hearing that Nurse Hill was spreading disparaging gossip related to her. Though Plaintiff Lieving did not directly hear any such statements from Nurse Hill, she allegedly heard through Steve Burnett, a manager in housekeeping, that "Kevin was pretty verbal throughout the organization about his—he was bragging that he had shut me up and that 'somebody should have shut up that [bitch] a long time ago.'" Lieving Dep. 48:13–49:7.[14] Even if true, this single instance of a derogatory comment adds little to Plaintiff's case.

Despite the growing collection of testimony by other employees that the event did not influence their opinion of or conduct towards Ms. Lieving, Ms. Lieving maintains that co-workers stopped eating lunch with her following the incident. Lieving Dep. 161:4–162:1. Prior to the incident, Ms. Lieving reports that she frequently had lunch with Katy Larck, Jackie Stewart, Michelle Roush, Denise Queen, Kathy Ingles, Terry Lucas, and Connie Davis. *Id.* Contrary to speculation by Ms. Lieving, Defendants present statements from these employees expressing that the incident with Kevin Hill did not cause them to stop eating lunch with Ms. Lieving. Def.'s Ex. M, ECF No. 57-3. Indeed, some among them explain that Ms. Lieving stopped eating lunch *with them* by no longer eating in the cafeteria. *Id.* Ms. Lieving does not offer evidence to explain why female employees no longer lunched with her or how this materially affected her work.

Finally, Ms. Lieving relies upon sexually explicit conversation by Mr. Schauer to conclude that gender-based discrimination was afoot in how PVH leadership addressed her complaint. Lieving Dep. 68–69. Inappropriate comments overheard by—but not directed to—Ms. Lieving included references to the genitalia of another PVH manager, referring to a female PVH manager

---

[14] Mr. Burnett, however, does not recall ever talking with Kevin Hill about Ms. Lieving and asserts that he "never told Ms. Lieving that [he] thought she was a bitch." Burnet Dec., Def's Ex. C, ECF No. 60-1 at 58. He further explained that "Ms. Lieving's incident with Kevin Hill, the fact that Kevin was nominated as employee of the month, and the fact that Ms. Lieving is female did not cause me to think less of Ms. Lieving or her ability to perform her job." *Id.*

as "his Playboy bunny" during a meeting, and discussing sexual relationships. *Id.* at 70–72, 197–98.

Ultimately, Ms. Lieving submitted a letter of resignation on November 27, 2012. Lieving Resignation Letter, ECF No. 59-1 at 6.   By her letter of resignation, Ms. Lieving cites the lack of accountability, unacceptable patient risks, and disruptive employee behavior and a failure to adequately address perceived disruptive behaviors such that Ms. Lieving felt chain of command had not been enforced and a male employee was instead allowed to "bully" her. *Id.*   On the same day that Ms. Lieving submitted her letter of resignation, Mr. Schauer provided her with positive letter of recommendation.

On January 23, 2015, Defendants filed the pending motion for summary judgment, requesting summary judgment on Plaintiff's hostile workplace claims under Title VII and the West Virginia Human Rights Act. Defs.' Mot. Summ. J., ECF No. 57.   Plaintiff responded that there is a genuine issue of material fact as to her claims, necessitating determination by a jury and rendering summary judgment inappropriate. Pl.'s Resp., ECF No. 59.   Defendant filed a reply, ECF No. 60, and the motion for summary judgment is now ripe for resolution.   After first explaining the standard for granting summary judgment, the Court will introduce the legal principles governing Plaintiff's claims and consider the appropriateness of summary judgment on the present record.

## II.   STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. V. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v.*

*Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).   "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson*, 477 U.S. at 249.   Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).   "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, No. 13-2212, 2015 WL 1062673 (4th Cir. March 12, 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice & Procedure* § 2728 (3d ed. 1998)).   "The court therefore cannot weigh the evidence or make credibility determinations." *Id.* (quoting *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256.   Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.   "Even in cases where elusive concepts such as motive or intent are at

-11-

issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

"Mere speculation by the non-movant cannot create a genuine issue of material fact. *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).   "Any permissible inference to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.   However, such inferences must 'fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture.'" *Id.* (citations omitted).   "Genuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." *Barwick v. Celotex Corp.*, 736F.2d 946, 963 (4th Cir. 1984).

## III.   GENDER DISCRIMINATION CLAIMS

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).   "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).

A work environment may be characterized as "hostile" where it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).   In order to establish a claim for hostile work environment, a plaintiff must prove: (1) unwelcome

-12-

conduct; (2) based on sex; (3) sufficiently severe or pervasive to alter the conditions of employment thereby creating a hostile work environment; and (4) some basis for imputing liability to the employer. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001).   In a federal discrimination suit based on race or sex, a plaintiff may either offer direct proof of discrimination or she may proceed under the proof scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Distinguishing a hostile work environment claim from discrete act claims, the Supreme Court explained that the former, by its "very nature involves repeated conduct." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).   Unlike discrete acts, the unlawful practice "cannot be said to occur on any particular day." *Id.*   Instead, the unlawful practice occurs "over a series of days or perhaps years." *Id.*   The incidents comprising a hostile work environment often involve the "same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* at 120

Though it prohibits workplace discrimination, "Title VII is not a federal guarantee of refinement and sophistication in the workplace—in this context, it prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive. *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) (citations omitted).   As explained by the Fourth Circuit, requiring "severe or pervasive" behavior sets "a high bar":

> Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than "rude treatment by [coworkers]," *Baqir v. Principi,* 434 F.3d 733, 747 (4th Cir.2006), "callous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir.2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 276 (4th Cir.2000), are not actionable under Title VII.

*EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008); *Baskerville v. Culligan Int'l Co.*,

50 F.3d 428, 431 (7th Cir. 1995) (finding conduct was not sufficiently severe or pervasive to create hostile work environment where "[defendant] never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him, or to go out on a date with him. He made no threats. He did not expose himself, or show her dirty pictures.").

## IV.   ANALYSIS

Discrimination sometimes only reveals itself in subtle, indirect ways, and in such situations, a plaintiff's ultimate success will depend on careful weighing of the evidence and credibility determinations.   The evidence of discrimination in this case is largely circumstantial, creating a challenge in assessing the appropriateness of summary judgment.   However, as discussed below, that challenge is not so great as to foreclose summary judgment where Plaintiff's only evidence of gender-based discrimination is her own self-serving speculation, otherwise unsupported by the record and recounting relatively trivial and sporadic conduct. *See e.g., Hartsell*, 123 F.3d at 773 ("But the claims propounded by [Plaintiff]—even assuming them all to be true—are so trivial, so isolated, and so far from the paradigmatic case of sexual harassment, that summary judgment was clearly appropriate").

### A.   *Unwelcome Conduct Based on Plaintiff's Sex*

Defendants argue that there is insufficient evidence to enable a rational trier of fact to find that any of the events complained of were motivated by the fact that Plaintiff is a woman. Plaintiff argues that the following events or decisions are evidence of gender-motivated bias in the workplace: (1) the July 2012 incident with Nurse Hill; (2) the decision by PVH management to address that incident through a round-table discussion; (3) Defendant Schauer's decision to remove Plaintiff from the Administrative Council; and (4) PVH's allegedly unsatisfactory

-14-

response to Plaintiff's August 17, 2011 grievance.[15]   Examining each allegation in turn, the Court ultimately agrees that Plaintiff has offered no evidence beyond her own perception to support an inference that any of the conduct at issue was motivated by gender bias.   While not making any judgments with regard to weight or credibility, Plaintiff cannot stand on only her own opinions or perceptions.   *See Mackey*, 360 F.3d at 469-70 (citing *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir. 1988) (noting that in the analogous context of racial discrimination "a plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a *prima facie* case of discrimination.").

First, Plaintiff has not presented any concrete evidence to suggest that the incident with Nurse Hill was motivated by gender bias.   By her own deposition testimony, Plaintiff admits that she cannot say whether Kevin Hill's conduct toward her was motivated by the fact that she is a woman. Lieving Dep. 37:4–6, 39:4–12.   Given the language used and the circumstances of the incident, apart from the fact that Nurse Hill is male and Plaintiff is female, Plaintiff offers no evidence supporting an inference that Nurse Hill's conduct in that instance was motivated by the fact that Plaintiff is a woman.

Similarly, Plaintiff admits that she cannot say whether the decision by David Brown and Jackie Dye to hold an unnoticed round-table discussion rather than otherwise discipline Kevin Hill was motivated by gender bias. *Id.* at 174:22–175:18.   That Plaintiff was not satisfied with that

---

[15] Defendants maintain that Plaintiff's August 17, 2012 complaint is irrelevant, repeatedly referencing the uncontested fact that Kevin Hill never yelled at Plaintiff again after the round-table discussion.   Indeed, after the round-table discussion Nurse Hill and Plaintiff had no further social or professional interactions.   It is not lost on the Court, however, that Nurse Hill's alleged outbursts are merely the beginning, and not the end, of the alleged conduct that Plaintiff claims fostered a hostile work environment.   Contrary to Defendants' argument, Plaintiff can attempt to maintain a hostile work environment claim through reference to not only the discrete acts directly involving Nurse Hill, but also through reference to a number of incidents occurring over a period of time and involving the same managers.   *See Morgan*, 536 U.S. at 120.   Accordingly, the Court considers the total sweep of incidents and allegations set out by Plaintiff.

response does not independently support an inference that the response was driven by discriminatory animus.   In any event, the discussion was a reasonable and successful effort by her employer to resolve the matter.

Next, according to Plaintiff, Defendant Schauer's decision to remove her from the Administrative Council is evidence of gender-based discrimination curtailing her opportunity to advance. Lieving Dep. 18:9–17.   Plaintiff, however, herself testified that she had no reason to believe that decision was motivated by her sex. Lieving Dep. at 18:9–18.   Considering that Plaintiff was merely one among ten or more employees that were excused from service on the Administrative Council, the Court similarly struggles to find an inference that her removal was discriminatorily motivated.   This is especially so owing to the fact that Plaintiff has offered no summary profiles on the other employees culled from the group to enable the Court to make even an inference of gender-based discrimination.   Instead, Plaintiff leaves the Court only with her own speculation that she was removed because Defendant Schauer "wanted to have people around him that he could manipulate or that they would do the work for him." *Id.* at 19:12–19:15.   Even assuming that is true, the Court cannot say that such a motivation would give rise to a Title VII claim.   At best, if true, it would suggest that Defendant Schauer's, management practices and style were patently wanting, but not that he particularly discriminated against an employee on the basis of gender.

Finally, Plaintiff complains that PVH's allegedly inadequate response to her second grievance, presented after the round-table discussion, evinces gender based discrimination. Lieving Dep. 118:14–119:16.   Plaintiff explained that her perception of discriminatory animus is credible "in light of conversations that [Defendant Schauer] would have in [her] presence," referring to a relatively small collection of sexually explicit workplace comments made by

-16-

Defendant Schauer. Lieving Dep. 118:5–13.   Plaintiff further explained: "I don't think [Defendant Schauer] made a conscious decision because of the fact I was female.   I think it was so thoroughly ingrained in his being that because I am a female, it would go away." *Id.* at 119:21– 120:3.   While Plaintiff did allege sexually explicit comments, those comments were isolated, brief, and directed towards or spoken to others.   Apart from Plaintiff's own speculation as to the import of those relatively isolated and benign comments, there is no concrete evidence of discriminatory employment practices by PVH relative to other employees nor is there any evidence of other employees bringing similar complaints.

In short, Plaintiff has failed to present evidence beyond her own self-serving speculation that would allow a reasonable trier of fact to conclude that Nurse Hill's interactions with her or responses thereto by PVH managers were gender-based.   An issue of material fact cannot be generated from mere "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz*, 896 F.2d at 8.   The concrete evidence of gender discrimination ostensibly starts and stops at the plain fact that Nurse Hill is male and Ms. Lieving is female, and Plaintiff therefore fails to create even an issue of material fact as to whether the conduct at issue was impermissibly gender-based.[16]

### B.  *So severe or pervasive as to create an objectively hostile work environment*

As noted above, Title VII does not guarantee a perfectly cordial and professional workplace.   "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993);

---

[16]  Without evidence creating a material issue of fact as to whether the relevant conduct was motivated by gender, Plaintiff's state-based claims under the West Virginia Human Rights Act, §§ 5-11-1 to -20, must fail along with her Title VII claims.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (explaining that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal quotations and citations omitted)); *Hartsell*, 123 F.3d at 773 (while co-employees may well have been "difficult to work with, insensitive, immature, and even insulting," "[n]one of the alleged comments were even vulgar, much less obscene," and therefore the conduct complained of was not actionable under Title VII).   In determining whether a workplace is objectively hostile, a court considers factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Faragher*, 524 U.S. at 787–88.   Looking at all the circumstances and viewed in the light most favorable to Plaintiff, the Court readily recognizes that PVH became a subjectively unpleasant workplace environment for Plaintiff.   That said, Plaintiff has failed to provide concrete evidence suggesting that such conditions were so severe and pervasive as to create an objectively hostile or abusive environment.

It is undisputed that Plaintiff and Nurse Hill had an unsettling interaction in the presence of other employees, that they both participated in a round-table discussion, and that no subsequent overt incidents occurred between them.   Though Plaintiff speculates as to some workplace conspiracy designed to humiliate and discriminate against her, she has not presented any concrete evidence supporting such speculation.   While recounting a handful of isolated sexually explicit comments, none of the isolated comments were directed toward Ms. Lieving.   In short, at best, Ms. Lieving complains of sporadic, relatively mild, and isolated conduct that did not result in adverse employment action or even criticism of her performance during the relative time period. Even making every possible inference in Plaintiff's favor, there is simply no issue of material fact

-18-

as to whether the conditions of employment were so severe and pervasive as to create an objectively hostile work environment.

### V.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 57) is **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        April 2, 2015

ROBERT C. CHAMBERS, CHIEF JUDGE

-19-